IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ADAM STRAYHORN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | File No. 1:18-CV-01391-WMR |
| UNIBLOC-PUMP, INC., a Georgia | ) | |
| Corporation, HARRY SODERSTROM, | ) | |
| and BHAVESH PATEL, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants Unibloc-Pump, Inc. Harry Soderstrom, and

Bhavesh Patel and file this their Memorandum in Support of Defendants' Motion

for Summary Judgment, showing the Court the following:

### INTRODUCTION

Plaintiff Adam Strayhorn ("Strayhorn") asserts claims against his former

employer, Unibloc-Pump Inc. ("Unibloc-Pump") under the Fair Labor Standards

Act ("FLSA") for failure to pay for all hours worked and for overtime. *See*

Complaint [Doc. 1], Counts I & II.  The dispositive legal question is whether

–1–

Strayhorn was an exempt employee during the timeframe in issue – March, 2016 to December, 2017.[1]  If exempt under the FLSA, Strayhorn cannot recover.

Unibloc-Pump, Inc. ("Unibloc-Pump") is a manufacturer of stainless-steel displacement pumps and valves with a focus on pharmaceutical, food, and beverage applications.  Strayhorn was employed from November, 2014 until December 18, 2017.  He began as a "Pump Builder" (a/k/a pump technician or "pump tech") and was paid on an hourly basis.  Strayhorn was promoted to Production Supervisor, a salaried and exempt position, in March, 2016 after conversations over a period of time occurred between Strayhorn, Bhavesh Patel (the Operations Manager), and the owners of the company.  Strayhorn had expressed an interest in the position and chose to accept it when offered. On December 7, 2017, Strayhorn resigned, by letter, from his position as Production Supervisor, noting that he had accepted a position as "Production Manager in different field."  This litigation followed.

The evidence of record overwhelmingly establishes that Strayhorn was an exempt employee during the relevant period and Plaintiff cannot support his claims

---

[1] See Plaintiff's Initial Disclosures [Doc. 15], ¶ 1: "The issues to be decided are whether Defendant can prove by clear and convincing evidence that Plaintiff was exempt from the overtime provisions of the FLSA."

with evidence that is significantly probative in refuting the facts that establish

Defendants' entitlement to summary judgment.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate where the pleadings and supporting

materials establish that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). The nonmovant must show

specific facts to support that there is a genuine dispute. *Celotex* at 323-34.  The

nonmovant's evidence must be significantly probative to support the claims.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the [nonmovant's]

evidence is merely colorable, or is not significantly probative, summary judgment

may be granted." *Id.* at 249-50.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I.  Plaintiff was an Exempt Employee and Not Entitled to Overtime Compensation

Under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.,* an

employer must compensate a non-exempt employee who works more than forty

hours a week at one and one-half times his regular rate. 29 U.S.C. § 207(a)(1). Any

worker who is employed as a "bona fide executive", however, is considered to be

exempt from the overtime requirements. 29 U.S.C. § 213(a)(1).  "The question of

whether Plaintiff falls within the executive employee exemption is a question of law for the Court." *Martin v. S. Premier Contractors, Inc.*, 2013 WL 822635, at *6 (N.D. Ga. Mar. 6, 2013).

In this case, Plaintiff alleges entitlement to overtime from March 1, 2016 until December, 2017 - the period within which Plaintiff served as Production Supervisor. Complaint, ¶¶ 20-23 [Doc. 1].  The following will show that Plaintiff was an *exempt* employee for the relevant timeframe.

According to U.S. Department of Labor regulations interpreting the applicable exemption in effect during the period for which Plaintiff claims overtime, bona fide executive employees are those (A) who are compensated on a salary basis above a certain amount; (B) whose primary duty is the management of the enterprise or a customarily recognized department or subdivision; (C) who customarily and regularly direct the work of two or more other employees; and (D) who have the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, or change in status of other employees are given particular weight. 29 C.F.R. § 541.100(a).

### A.    Strayhorn's Salary Met the Minimum Threshold

To satisfy the first prong of the executive exemption test, an employee must be compensated on a salary of not less than $455 per week. 29 C.F.R. §

541.100(a)(1).[2]  It is undisputed that after he became Production Supervisor in late February, 2016, Strayhorn began earning an annual base salary of $45,000.  (Ex. 1, p. 2; Strayhorn Depo. 172/6-8).  One month later, Strayhorn's base salary was raised to 50,000 (as of April, 2016); then raised to $58,000 (as of January, 2017); and to $60,000 (as of April, 2017). (Ex. 1, pp. 1-2).[3]  Strayhorn's salary during the contested period clearly satisfies the first prong of the exemption.

### B.   Strayhorn's Primary Duty was Management of a Department

Under the DOL regulations implementing the FLSA, "management" generally includes activities such as:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in

---

[2]   The "salary test" presently requires workers to make at least $455 per week (equating to $23,660 annually) on an annual basis to be exempt from overtime.  On May 23, 2016, the Department of Labor instituted a New Rule revising 29 C.F.R. Part 541. The New Rule purports to double the minimum salary level for employees under the executive exemption.  The New Rule would have taken effect on December 1, 2016, but its effectuation was enjoined nationwide by the United States District Court for the Eastern District of Texas, which declared the New Rule invalid.  *See Mobley v. Shoe Show, Inc.*, 2018 WL 6357499, Footnote 8 (S.D. Ga. Sept. 24, 2018), *citing Nevada v. United States Dep't of Labor*, 2017 WL 3837230, at *1 (E.D. Tex. Aug. 31, 2017).  *See also Buford v. Superior Energy Servs., LLC*, 2018 WL 2465469, at *9 n.2 (E.D. Ark. June 1, 2018) (applying regulations in effect prior to injunction).

[3]   Exhibit 1 filed herewith, contains accurate information regarding Strayhorn's hourly and base salary pay history at Unibloc-Pump. (Strayhorn Depo. 169/13-14; 170/20 – 172/17).

supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

"Primary duty" is addressed in the DOL's regulations as follows:

The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, [1] the relative importance of the exempt duties as compared with other types of duties; [2] the amount of time spent performing exempt work; [3] the employee's relative freedom from direct supervision; and [4] the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Langston v. Lookout Mountain Cmty. Servs.*, 2017 WL 6612866, at *10–11 (N.D.

2017)[4], citing 29 C.F.R. § 541.700(a).

---

[4] *report and recommendation adopted* at 2017 WL 6619236 (N.D. Ga. Nov. 13, 2017).

The Eleventh Circuit has rejected a "categorical approach" to deciding whether an employee is an exempt executive. *Chin Hui Hood v. JeJe Enterprises, Inc.*, 207 F. Supp. 3d 1363, 1373 (N.D. Ga. 2016).  Instead, the Eleventh Circuit recognizes that the primary duty inquiry is "necessarily fact-intensive," consistent with the DOL regulation, which provides that the "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.*, citing 29 C.F.R. § 541.700(a).

### (1)  Management

In the case at bar, the record demonstrates that Strayhorn engaged in numerous and significant *management* activities, as contemplated by 29 C.F.R. § 541.102:

### • *Interviewing, selecting, and training employees*

Once he became Production Supervisor, Strayhorn routinely participated in interviews of prospective employees and Pump Techs were not hired without Strayhorn's input.  (Strayhorn Depo. 152/21-24; 153/6-9; 253/11-13; 256/2-5). Strayhorn also regularly reviewed resumes from job candidates[5] and

---

[5] Defendants' Exhibit 10, filed herewith, contains numerous emails from October of 2016 to October of 2017 demonstrating Strayhorn's involvement in reviewing resumes of job candidates applying for warehouse or pump tech

communicated with Operations Manager Patel about prospects under consideration. (Strayhorn Depo. 153/16-24; Patel Depo. 152/10-16).  Strayhorn also had the opportunity to review job descriptions for open positions before they were posted on various websites.  (Patel Depo. 149/13-16).

  • *Training*

Strayhorn trained Pump Techs on how to build pumps.  (Caudill Depo. 20/10-11; Strayhorn Depo. 125/24 - 126/4).  Further, Strayhorn was part of the team, along with Bhavesh Patel (Operations Manager) and Calle Danielson (Applications Engineer) that created a detailed "Pump Tech Training Program" in 2017. (Strayhorn Depo. 86/2-14; 87/4-14; Patel Depo. 140/15-17).  The training document is a highly detailed sequential listing of at least eighty steps involved in building pumps and was the result of multiple meetings by the three individuals mentioned "over a period of time." (Strayhorn Depo. 89/15-20; 90/9-11; 94/18/22).

The intent was for the training document, which involves the core business of the company, to be used by pump technicians as a guide in their assembly and

---

positions. (See Ex. 10, Unibloc 001818: "Please review and advise if any of the candidates stand out;" Unibloc 001782: "Bhavesh, here are the ones I feel we should call in to interview. From what I can see, Aaron Hayes would be a good candidate for shipping and the others for the Tech position. Would you want me to call and set up the interviews?"; and see Patel Decl. ¶ 15).

building of pumps.  (Strayhorn Depo. 90/15-19, 24 – 91/4).  No formal pump tech training program previously existed.  (Strayhorn Depo. 93/23-25).

 • *Directing the work of employees*

The resume used by Strayhorn in November of 2017 when he was seeking other employment listed (among other things) the following regarding Strayhorn's work experience at Unibloc-Pump: "lead daily operations of production staff and warehouse/provide training to new employees"; "lead in OSHA compliance"; "Certified forklift trainer" (Ex. 9; Johnson Depo. 14/5-8; 15/5-8; 16/4-7; 17/2-11; 23/20-24). Post-promotion, the title "Production Supervisor" appeared next to Strayhorn's name in emails sent from his company email address. (Ex. 19; Strayhorn Depo. 98/6-10).

Brian Whitley, a pump tech from July, 2016 until late March, 2019, was interviewed and trained by Strayhorn; and understood that Strayhorn supervised the warehouse and production areas. (Whitley Depo. 5/23 – 6/2; 8/6-11; 23/19-23; 32/17-20; 37/14-19).  Whitley understood that he reported to Strayhorn and Strayhorn was the person to whom Whitley directed requests or concerns about time off or vacation.  (Whitley Depo. 37/21 - 38/1).

Robert Green, a "warehouse associate" interviewed by Strayhorn, overlapped Strayhorn's employment at Unibloc-Pump for three months. (Green

Depo. 9/16-18; 13/12-14; 20/8-11; 21/9-12).  Strayhorn was introduced to Green as the production and warehouse supervisor; and Green likewise understood that Strayhorn had supervisory responsibility over those areas and that he reported to Strayhorn.  (Green Depo. 31/16 – 32/1).

Jason White began his employment at Unibloc-Pump in March, 2017 working in the warehouse; and he moved into the production area as a pump tech in February, 2018. (White Depo. 8/9-11; 18/11-13).  White understood that Strayhorn had responsibility and oversight for the warehouse and production areas and he went to Strayhorn with questions or requests about his schedule; and with requests about vacation time and time off.  (White Depo. 38/13 - 39/6).

### • Planning and apportioning work

Work assignments to pump techs were controlled by a Production Schedule that was maintained on the company's server. (Caudill Depo. 17/16-19).  The Production Schedule provides "a basic outline of what all we had to build in the back" and helped Strayhorn with his supervisory responsibilities over the Pump Techs. (Strayhorn Depo. 122/6-11).  Strayhorn regularly met with Patel regarding the production schedule and they discussed "what was coming down the pipe." (Strayhorn Depo. 247/24 – 248/4).  The pump technicians supervised by Strayhorn were not present in those meetings. (Strayhorn Depo. 248/16-18).

Strayhorn used his company laptop/tablet device to access the Production Schedule and "change the status of a build;" and to edit information in the Production Schedule. (Strayhorn Depo. 121/6-9; 122/13-16).  Strayhorn was the only employee in the production area to use a laptop and none of the Pump Technicians supervised by Strayhorn had the ability to edit information in the Production Schedule.  (Caudill Depo. 45/8-11; Strayhorn Depo. 123/7-12). Strayhorn possessed "edit" authority to make the assignment of pump builds at his discretion, even "against [Patel's] recommendation." (Strayhorn Depo. 125/13-23).

As far as Brad Caudill, the Quality Engineer (who was familiar with the Production Schedule) was concerned, Strayhorn "had always been involved" in the assignment of work to pump techs. (Caudill Depo. 17/13-14; 21/16-18).  Caudill was aware that Strayhorn "assigned certain pump technicians to do certain jobs based on their skill set" and that Strayhorn "could edit the entire schedule if he wanted." (Caudill Depo. 44/25 - 45/1-3).

An email exchange between Strayhorn and Patel demonstrates that Patel withdrew from involvement in making initial assignments in the Production Schedule and handed this over to Strayhorn. (Ex. 12; Patel Depo. 188/11-14; 189/7-22).  In the exchange, Strayhorn says "it's time for me to get this operating as a production department should." (Ex. 12).

Additionally, Department supervisors "sign off" on hours worked submissions turned in by hourly employees. (Schiller Depo. 32/1-4). Strayhorn reviewed and approved the hours submitted by the pump techs he supervised, reviewed overtime; and both the pump tech and Strayhorn would sign off on the form. (Schiller Depo. 40/20-25).

> • *Appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status.*

Strayhorn provided Patel with input regarding how his pump techs were performing throughout the course of a year. (Patel Depo. 143/24 – 143/1). Strayhorn was also involved in the routine three-month evaluations of newly hired pump techs. (Patel Depo. 196/8-16). "Adam, myself, and the candidate would review how they are doing." (Patel Depo. 196/15-16). Jason White recalls meeting with Strayhorn and Patel for his three-month evaluation. (White Depo. 19/20-24; 34/12-22).

Strayhorn recommended raises as he felt appropriate for the pump techs he supervised. (Strayhorn Depo. 127/6-24; 253/5-7). Strayhorn recommended for Andre Hayes to be moved "up front." (Strayhorn Depo. 250/8-9). Strayhorn's suggestions, recommendations, and input were "very important" to Patel. (Patel Depo. 197/4-8).

*• Handling employee complaints, grievances, and discipline*

While employed as Production Supervisor, Strayhorn regularly disciplined employees and warned them about unacceptable behavior at work.  Strayhorn acknowledges his authority to discipline pump technicians he supervised. (Strayhorn Depo. 253/23-25).  Records show that from June, 2016 through July, 2017, Strayhorn signed and issued multiple "Employee Warning" Reports to various Pump Technicians for violations of company policies and/or conduct issues -- Exhibit 13 filed herewith contains 8 of these.  Strayhorn has "written up people" in Patel's absence.  (Patel Depo. 156/22-25).  The purpose of an Employee Warning Report is to "make an employee aware of an issue." (Strayhorn Depo. 62/7-10).

On October 9, 2017, Strayhorn signed the "Separation Notice" submitted to the State of Georgia Department of Labor in connection with the termination of Cartier Teamer, a shipping employee in the warehouse who was let go due to his "poor performance and lack of motivation." (Ex. 14; Strayhorn Depo. 84/3-7). Strayhorn signed as Authorized Agent for Unibloc-Pump and presented the form to Teamer. (Strayhorn Depo. 83/20 – 84/7, 14-15).

Strayhorn also executed, on Unibloc-Pump's behalf, "Forklift Operator Certification" forms for warehouse employees Cartier Teamer and Steven Goodlow, the purpose of which was to certify the instruction, evaluation, and

competency of these employees to drive a forklift. (Ex. 15; Strayhorn Depo. 72/3-5, 12-14; 83/10-14).  Strayhorn served as the "Trainer/Evaluator" and made the certifications and signed the document on behalf of Unibloc-Pump.  (Strayhorn Depo. 72/15-21; 83/15-19).  Had there been a need for improvement, that would have been Strayhorn's determination to make.  (Strayhorn Depo. 73/5-8).

> • *Providing for the safety and security of employees or property*

Strayhorn "covered" safety in the plant. "That was his department." (Caudill Depo. 35/3-7, 11; Ex. 9, Strayhorn Resume). In the Fall of 2017, Strayhorn reached out, on Unibloc-Pump's behalf, to the Georgia Tech OSHA Consultation Program "so that the company could be OSHA compliant." (Strayhorn Depo. 96/16-21; 97/11-12; 99/15-19; Ex.19, Email chain).  Strayhorn was Unibloc-Pump's point person for this project, which culminated in an inspection on December 4, 2017. (Strayhorn Depo. 100/9-11; 102/17-19).  All of Adam's communications with individuals from Georgia Tech were on Unibloc-Pump's behalf. (Patel Decl. ¶ 20).[6]

Brad Caudill has been employed at Unibloc-Pump as the Quality Engineer since July, 2016. (Caudill Depo. 7/3-4). Caudill's job involved keeping up with

---

[6] *See also* Exhibits 20, 21, 22, and 23 filed herewith.

compliance records, preparing for audits from third parties, certifying conformity, doing inspections, and generating material test reports. (Caudill Depo. 7/25 – 8/4). Strayhorn would "take care of" safety issues that affected the production area where the pump technicians worked.  (Caudill Depo. 15/7-18).[7]  Though Strayhorn might discuss such matters with Caudill or receive Caudill's feedback, "it was ultimately [Strayhorn's] decision."  (Caudill Depo. 15/21-24).

In light of the foregoing evidence relating to Plaintiff's job as Production Supervisor, there can be no genuine dispute that he consistently performed numerous and significant *management* activities as contemplated by 29 C.F.R. § 541.102.

### (2)  Primary Duty

It is likewise clear that Strayhorn's "primary duty" was the management of a "customarily recognized department or subdivision."  First, the production and warehouse areas are clearly operational units within Unibloc-Pump.  "The phrase 'a customarily recognized department or subdivision' is intended to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function." 29 C.F.R. §

---

[7] For example, Strayhorn recognized the lack of eyewash stations to be an OSHA compliance concern, so Strayhorn "would buy the eyewash stations, put them where they needed to be, and the issue was remedied."  (Caudill Depo. 15/15-20).

541.103(a). There can be no reasonable dispute that the group(s) supervised by Strayhorn is/are customarily recognized department(s).[8]

Likewise, there can be no reasonable dispute about the fact that Strayhorn's "primary duty" during the time frame in issue was management of the production area and warehouse. Most notably, the resume used by Strayhorn in November of 2017 when he was seeking other employment listed (among other things) the following regarding Strayhorn's work experience at Unibloc-Pump: "lead daily operations of production staff and warehouse." (Ex. 9; Johnson Depo. 14/5-8; 15/5-8; 16/4-7; 17/2-11; 23/20-24).

Moreover, Accounting Manager Schiller understood Strayhorn's main job duty after he was promoted was "to supervise the pump techs and the shipping department." (Schiller Depo. 42/10-13). Likewise, Quality Engineer Brad Caudill, when asked what he observed as Strayhorn's primary job duty, testified "he was in charge of production. He was in charge of the pump technicians and what kinds of jobs they would do. . .he oversaw the production area and the warehouse." (Caudill Depo. 7/3-4; 30/3-8). This testimony is in harmony with the testimony of pump

_____

[8] The pump technicians, who build the pumps sold by the company, "are their own department." (Schiller Depo. 22/13-14). An organizational chart from the Spring/Summer of 2016 shows Strayhorn as the lead over the "Warehouse" and pump techs; and Strayhorn himself refers to the "production department." (Ex. 12; Ex. 24; Patel Decl. ¶ 26; Strayhorn Depo. 138/2-5).

techs and warehouse employees supervised by Strayhorn.  (*See* Whitley Depo. 5/23
– 6/2; 8/6-11; 23/19-23; 32/17-20; 37/14-19; Green Depo. 31/16 – 32/1; and White
Depo. 38/13-20).

29 C.F.R. § 541.700(a) lists four factors "to consider" but not be "limited"
by when determining an employee's "primary duty."  Looking at the evidence in
light of these factors reveals the following:

> ● *Relative importance of exempt duties as compared to other
> types of duties*

As Production Supervisor, Strayhorn supervised at least 14 employees
between 2016 and 2017. (Patel Decl. ¶ 9).  The most important aspect of his job
was to lead, supervise, and manage the pump technicians and warehouse
employees; and Strayhorn was responsible for production output.  His supervision
and handling of pump technicians, in particular, was essential to the proper
functioning and day to day operation of the company. (Patel Decl. ¶ 9).

Strayhorn's managerial responsibilities did not cease when he was engaged
in pump building or manual tasks.  As Production Supervisor, Strayhorn was
expected to carry out his management duties simultaneously with any non-
management duties he performed; and he remained at all times responsible for his
group's timely output and adherence to the Production Schedule.  Strayhorn was
never told or directed to build pumps himself during any defined time period.

When he did build pumps, this occurred when Strayhorn chose to do so. (Patel Decl. ¶ 10).

Thus, Strayhorn's management duties were critical to the operation of the production area and warehouse. The Operations Manager, Patel, relied on him to ensure that his group was producing quality pumps and keeping up with the pace of production. This factor weighs in favor of classifying Plaintiff as *exempt*. *See Sappington v. Style-Line Furniture*, 2007 WL 3355838, at *7 (N.D. Miss. Nov. 8, 2007) (finding line supervisors exempt because they oversaw quality and timeliness of production and upper management looked to them to have their lines produce the product on schedule).[9]

- ### *Amount of time spent performing exempt work*

While the amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee, it is not dispositive of the primary duty issue. See 29 C.F.R. § 541.700(b). There is no requirement that exempt employees spend more than 50 percent of their time

---

[9]  *See also Langston v. Lookout Mountain Cmty. Servs.*, 2017 WL 6612866, at *11 (N.D. Ga. Oct. 11, 2017), *report and recommendation adopted,* 2017 WL 6619236 (N.D. Ga. Nov. 13, 2017) (Summary Judgment for employer even though plaintiff, "house manager" at a residence operated for disabled individuals, performed much of the same work as the employees she supervised where "the management activities she performed were essential to the proper functioning of Flintstone House. [Plaintiff's supervisor] relied on Ms. Langston to manage the employees and activities at the Flintstone House.").

performing exempt work. "Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." 29 C.F.R. § 541.700(b).

Thus, "[c]ourts have found FLSA's executive exemption to apply even to employees who spent the vast majority of their time performing non-exempt work." *Langston*, *supra*, 2017 WL 6612866, at *11.[10]  This is because courts recognize that the employee's primary duty is what he does that is of principal value to the employer. *See*, *e.g*., *Jackson v. Advance Auto Parts, Inc*., 362 F.Supp.2d 1323, 1334 (N.D. Ga. 2005).[11]

---

[10] *Langston* cited *Dipasquale v. Docutek Imaging Solutions, Inc.*, 2010 WL 4703752, at *6 (S.D. Fla. Nov. 12, 2010) (applying the executive exemption to a service manager who testified that he spent only ten to twenty percent of his time performing exempt duties); *Debrecht v. Osceola Cty.*, 243 F. Supp. 2d 1364, 1370 n.11, 1370-72 (M.D. Fla. 2003) (finding that the primary duty of battalion chiefs in an emergency services department was still management even though they spent eighty-five percent of their time performing nonexempt tasks).

[11] *See also Jones v. Virginia Oil Co.*, 69 Fed. Appx. 633 (4th Cir. 2003) (holding manager of combination fast food and convenience store was properly classified as exempt despite allegations that he spent 75%-80% of his time performing non-exempt work); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1113-16 (9th Cir. 2001) (finding manager of recreational park exempt despite the claim that he spent 90% of his time performing non-exempt tasks); and *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 866-67 (N.D.Tex. 2001) (entering summary judgment against manager of bakery who claimed he spent 90% of his time performing non-managerial tasks).

Because Strayhorn's duties involved, in part, building pumps and other potentially non-exempt work (Ex. 6, Job Description, p. 2), it is appropriate to note that the DOL regulations provide that an employee may perform both exempt and non-exempt work concurrently without losing exempt status:

> Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met. Whether an employee meets the requirements of § 541.100 when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in § 541.700. Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. . .

29 C.F.R. § 541.106(a).

District Courts in Georgia have recognized that "the DOL has included analysis of 'Concurrent Duties' to address the special circumstances of working supervisors." *Langston*, *supra*, 2017 WL 6612866, at *12, citing *Jackson v. Jean Coutu Group (PJC) USA, Inc.*, 2007 WL 1850710, at *4 (S.D. Ga. June 26, 2007).[12]

---

[12] In *Langston*, the plaintiff was found to be exempt where "[t]he record shows that if plaintiff performed nonexempt work, it was generally her decision

Likewise, in the case at bar, Strayhorn simultaneously continued to oversee pump techs even while engaged in non-exempt tasks and he remained responsible for his group's output. (Patel Dec. ¶ 10).  Strayhorn's resume in November of 2017 indicated that his experience at Unibloc-Pump involved "lead[ing] daily operations of production staff and warehouse." (Ex. 9).  Strayhorn was never told or directed to build pumps himself during any defined time period and when he did build pumps, this occurred when Strayhorn chose to do so. (Patel Dec. ¶ 10).  The concurrent nature of Plaintiff's exempt and non-exempt duties do not disqualify him from exempt status and he is properly treated as exempt. *Langston*, *supra*; *Jackson*, *supra*.

### • *Relative freedom from direct supervision*

The management duties executed by Strayhorn and the manner in which he exercised them indicate that he was relatively free from direct supervision. Moreover, the record has no evidence that Operations Manager Patel or anyone else provided Strayhorn with any detailed instructions regarding how to do his job.

---

regarding when to do so. Moreover, even if plaintiff performed nonexempt work, she was still responsible for the successful operation of Flintstone House." 2017 WL 6612866, at *12.  *See also Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1334-35 (N.D. Ga. 2005) (finding exempt assistant managers who claimed that they spent ninety percent of their time performing manual tasks because they simultaneously continued to oversee subordinates and ensured store operations).

This factor favors Plaintiff's status as exempt.  *See Langston*, supra, 2017 WL

6612866, at *12.

> • *Relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee*.

When he began his employment at Unibloc-Pump in 2014 as a pump

builder, Strayhorn was an hourly-paid employee earning $15 per hour. (Ex. 1;

Strayhorn Depo. 170/23 – 171/6).  As of June, 2015, he was earning $19 per hour.

(Ex. 1, p. 2; Strayhorn Depo. 171/22 – 172/5).  After becoming Production

Supervisor in late February, 2016, Strayhorn began earning an annual base salary

of $45,000.  (Ex. 1, p. 2; Strayhorn Depo. 172/6-8).  Strayhorn's base salary was

quickly raised to $50,000 as of April, 2016; then to $58,000 as of January, 2017;

and to $60,000 as of April, 2017. (Ex. 1, pp. 1-2).

In 2016, the year he became a salaried employee (which occurred in late

February), Strayhorn's adjusted gross pay was over **$56,000**. (Ex. 3, Unibloc-

000147).  His adjusted gross pay in 2017 was over **$73,000**. (Ex. 3, Unibloc-

000148).

By contrast, during the years when Adam was the Production Supervisor,

pump technicians were generally paid between $15 per hour and $20 per hour.

(Patel Decl. ¶ 7).  $15 per hour would yield $32,000 annually and $20 per hour

would yield $41,600.  These numbers are far less than the $50,000 salary

Strayhorn was earning after one month as Production supervisor - without even

considering the adjusted gross income amounts Strayhorn earned while salaried.

This factor weighs towards a finding that Plaintiff was exempt.  *See Langston*,

*supra*, at *12 ("Ms. Langston earned $26,000 per year. The Instructors [plaintiff

supervised] (save Ms. Poss) earned $18,000 per year. This factor also favors

plaintiff's status as an exempt executive.")

### C. Plaintiff Customarily and Regularly Directed Two or More Employees

At all times when Strayhorn was the Production Supervisor, he supervised

two or more employees, including pump technicians and warehouse employees.[13]

### D. Plaintiff's Recommendations Regarding Hiring, Firing, Advancement and/or Change of Status Were Given Particular Weight

As Production Supervisor, Strayhorn routinely participated in interviews of

prospective employees and Pump Techs were not hired without his input.

(Strayhorn Depo. 152/21-24; 153/6-9; 253/11-13; 256/2-5).  Strayhorn also

regularly reviewed resumes from job candidates and communicated with

---

[13] The following employees were pump technicians and/or warehouse
employees in 2016 and/or 2017 and were supervised by Strayhorn: Brandon Cass,
Steven Goodlow, Andrae Hayes, Stuart Jones, Patrick Heffernan, Wade Morris,
Bradley Pearson, Nathan Pearson, George Stevenson, Linwood Taylor, Cartier
Teamer, Jason White, and Brian Whitley. (Patel Declaration ¶ 8).

Operations Manager Patel about prospects under consideration. (Ex. 10; Strayhorn Depo. 153/16-24; Patel Depo. 152/10-16).  Strayhorn recommended raises as he felt appropriate for the pump techs he supervised (Strayhorn Depo. 127/6-24; 253/5-7) and provided Patel with input regarding how his pump techs were performing throughout the course of a year (Patel Depo. 143/24 – 143/1; 196/8-16; White Depo. 19/20-24).  Strayhorn's suggestions, recommendations, and input were "critical" to Patel. (Patel Depo. 197/4-8).  Terminations of pump techs did not occur without Strayhorn's input. (Patel Depo. 158/1-3).  Given the evidence of record, it is clear that Plaintiff's Production Supervisor role involved substantial input into hiring, firing, advancement, and/or status changes with regard to other employees; and that his input was given particular weight.  See *Langston*, *supra*, 2017 WL 6612866, at *14 (N.D. Ga. Oct. 11, 2017).[14]

## II.   There is No Basis for Holding Harry Soderstrom Personally Liable for Plaintiff's Claims.

Plaintiff seeks to hold Harry Soderstrom liable for his FLSA claim, however, an individual cannot be liable for violating the overtime provision of the FLSA unless he is an "employer" within the meaning of the FLSA. *See* 29 U.S.C. §

---

[14] Exempt status supported by evidence that "with regard to hiring, the record shows that plaintiff scheduled interviews with prospective employees.  She interviewed them and then made recommendations to her managers about whom to hire.  LMCS in turn relied upon recommendations. Thus, Ms. Langston's recommendations were given particular weight."

207(a)(l); *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.,* 515 F.3d 1150, 1160 (11th Cir. 2008).  To qualify as an "employer," a corporate officer or owner "must either be involved in the day-today operation or have some direct responsibility for the supervision of the employee." *Id.*  Here, the record is devoid of any evidence that Soderstom either (1) exercised substantial control related to Unibloc-Pump's FLSA obligations or (2) was directly responsible for supervising the Plaintiffs' day-to-day activities. *See* Defendants' Statement of Material Facts, ¶¶ 139-149.  Therefore, Defendant Soderstrom should be dismissed for this additional reason.

## CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment.

This 25th day of April, 2019.

/s/ Christopher G. Moorman
Christopher G. Moorman
Georgia Bar No. 521490

Attorney for Defendants

MOORMAN PIESCHEL LLC
One Midtown Plaza
1360 Peachtree Street, NE
Suite 1205
Atlanta, GA  30309
(404) 898-1242
cgm@moormanpieschel.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ADAM STRAYHORN,                    )
                                   )
       Plaintiff,                  )
                                   )
v.                                 )        Civil Action
                                   )        File No. 1:18-CV-01391-WMR
UNIBLOC-PUMP, INC., a Georgia      )
Corporation, HARRY SODERSTROM,     )
and BHAVESH PATEL,                 )
                                   )
       Defendants.                 )

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have electronically filed MEMORANDUM IN

SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT with

the Clerk of Court using the CM/ECF system, which will send notification of such

filing to the following:

E. Linwood Gunn, IV
Roach, Caudell, & Gunn, LLP
111 West Main Street
P.O. Box 677
Canton, GA 30114-0677

This 25th day of April, 2019.

MOORMAN PIESCHEL, LLC

/s/ Christopher G. Moorman
Christopher G. Moorman

Georgia Bar No. 521490
Attorney for Defendants

One Midtown Plaza
Suite 1205
1360 Peachtree Street, N.E.
Atlanta, Georgia 30309
(404) 898-1243
cgm@moormanpieschel.com